Innovare, Ltd. v. SciTeck Diagnostics, Inc., 2023 NCBC 5.

STATE OF NORTH CAROLINA

HENDERSON COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 2180

INNOVARE, LTD., A Nevada
Limited Liability Company,

Plaintiff,

v.

SCITECK® DIAGNOSTICS, INC., A
Delaware Corporation,

Defendant.

**ORDER AND OPINION ON
PLAINTIFF'S MOTION TO DISMISS
COUNTERCLAIMS AND MOTION TO
STRIKE AFFIRMATIVE DEFENSES
AND DEFENDANT'S MOTION FOR
LEAVE TO AMEND**

THIS MATTER comes before the Court on Plaintiff's Motion to Dismiss Counterclaims and Motion to Strike Affirmative Defenses ("Motion to Dismiss," ECF No. 17) and Defendant's Motion for Leave to Amend Sciteck Diagnostics, Inc.'s Answer to Innovare Ltd.'s Complaint and Counterclaims ("Motion to Amend, ECF No. 44) (collectively, "Motions"). THE COURT concludes that the Motions should be GRANTED, in part, and DENIED, in part.

> *Kilpatrick Townsend & Stockton LLP by Joseph S. Dowdy and Elizabeth L. Winters for Plaintiff Innovare, Ltd., A Nevada Limited Liability Company.*
>
> *King Law Offices PLLC by J. Patrick A. Twisdale for Defendant Sciteck® Diagnostics, Inc., A Delaware Corporation.*

Davis, Judge.

### INTRODUCTION

1. The parties to this action agree that they entered into a distributorship agreement relating to a product manufactured by Defendant Sciteck Diagnostics, Inc. ("Sciteck") consisting of strips designed for COVID-19 testing. However, that is practically all that they agree upon. Indeed, the parties are the proverbial ships

passing in the night in terms of their respective pleadings in which they offer competing narratives regarding the nature, extent, and cessation of their business relationship. The issues currently before the Court concern the legal validity of the counterclaims and affirmative defenses asserted by Sciteck and whether Sciteck should be permitted to amend them.

## FACTUAL AND PROCEDURAL BACKGROUND

2. "The Court does not make findings of fact on a motion to dismiss [counterclaims] pursuant to Rule 12(b)(6)" and instead recites those factual allegations from the counterclaims that are "relevant and necessary to a determination of the [m]otion." *Chi v. N. Riverfront Marina & Hotel LLLP*, 2022 NCBC LEXIS 98, at **2 (N.C. Super. Ct. Aug. 24, 2022).[1]

3. "Sciteck is a corporation organized under the laws of Delaware[.]" (Am. Countercls. ¶ 1, ECF No. 44.1.) "Sciteck is a pioneer and innovator in the biological testing industry, including antigen testing for SARS-CoV-2" ("COVID-19"). (Am. Counterclaims ¶ 5.) Sciteck has created a COVID-19 test called SALIVAQUIK, a viral testing strip that requires "only a small saliva sample to quickly test for the virus." (Am. Countercls. ¶ 8.)

4. As background information, Sciteck's counterclaims explain how a medical product that has not yet received full regulatory approval may nonetheless

---

[1] As noted below, the Court is electing—in furtherance of judicial economy—to consider Plaintiff's arguments in support of its Motion to Dismiss as applied to Sciteck's proposed amended counterclaims. Accordingly, this opinion cites to the factual allegations and claims contained in the amended counterclaims rather than those set out in Sciteck's original counterclaims.

be used to "diagnose, treat or prevent serious or life-threatening diseases" under Emergency Use Authorization ("EUA") authority. (Am. Countercls. ¶ 13.) However, certain criteria must be met in order to obtain EUA approval, "including that there are no adequate, approved, and available alternatives." (Am. Countercls. ¶ 13.) The formal process for obtaining EUA approval involves "an application, relevant data and evidence, and a formal request that the FDA [Food and Drug Administration] issue an EUA for the device." (Am. Countercls. ¶ 15.) "[T]he FDA has the authority to require additional data and information on a case-by-case basis to ensure compliance with the statutory criteria for EUA approval of a specific device[,]" and the amount of required data can vary from device to device. (Am. Countercls. ¶ 17.)

5. Generally, a device's sponsor "engage[s] in studies and testing that are compliant with and sufficient for the FDA's EUA approval conditions." (Am. Countercls. ¶ 19.) This necessary testing is called Research Use Only ("RUO") activity, which the FDA strictly regulates, including requiring labeling of all subject devices "for research use only." (Am. Countercls. ¶ 21.) The FDA provides pre-EUA guidelines, "which include[] limiting testing 'to laboratories certified to perform high complexity testing, and at the point-of care when covered by the laboratory's . . . certificate for high complexity testing.'" (Am. Countercls. ¶ 26.)

6. In response to the growing need for COVID-19 testing devices as a result of the coronavirus pandemic, Sciteck began developing the SALIVAQUIK device. (Am. Countercls. ¶ 23.)

7.      Sciteck's counterclaims allege the existence of the SALIVAQUIK trademark, which is not federally registered "but holds all relevant rights of an unregistered trademark under both federal and state law, including common law." (Am. Countercls. ¶ 11.)

8.      Defendant Innovare Ltd. ("Innovare") "provides consulting, IT, and data management services." (Am. Countercls. ¶ 32.) In 2020, "Innovare was in need of an oral fluid testing laboratory to assist Innovare in performing reverse transcriptase polymerase chain reaction ('RT-PCR') testing." (Am. Countercls. ¶ 33.) Innovare engaged Sciteck to provide "oral fluid testing." (Am. Countercls. ¶ 34.) "Sciteck also became aware of Innovare's software utilized in connection with RT-PCR testing." (Am. Countercls. ¶ 34.)

9.      The parties subsequently entered into discussions "as to whether Innovare would be capable of providing software for purposes of allowing a user to interpret and validate the results of a SALIVAQUIK™ test device using a smartphone." (Am. Countercls. ¶ 35.) Innovare touted its experience in software development in compliance with federal regulatory schemes, including those of the FDA. (Amended Counterclaim ¶ 36.) Although the parties initially only drafted an agreement concerning the licensing of Sciteck's intellectual property, the parties ultimately agreed that Innovare would serve as a "non-exclusive distributor of the SALIVAQUIK™ device following EUA approval of the device." (Am. Countercls. ¶¶ 38–39.) Along with distribution, "Innovare was to provide [s]oftware for purposes of allowing a user to interpret the result of the SALIVAQUIK™ test device using a

smartphone." (Am. Countercls. ¶ 41.) The parties formalized this relationship in a document titled Licensing and Master Distributor Agreement ("Distributor Agreement") that was executed by the parties on 18 February 2021. (Distributor Agreement, ECF No. 2, Ex. A.)

10. Because the Distributor Agreement—which is neither a model of specificity nor clarity[2]— is relatively short and its terms are highly relevant to the parties' dispute, the Court deems it helpful to quote the terms of the document largely verbatim:

> This Agreement . . . is made and entered into on February 18, 2021 (the "Effective Date") by and between Innovare, Ltd. a Nevada limited liability company ("Innovare") and Sciteck® Diagnostics, Inc., a Delaware corporation ("Sciteck").
>
> WHEREAS, Innovare has developed and owns intellectual property and proprietary information (the "IP/Content") to include but not limited to software, websites (e.g. SalivaQuick [sic]), PDA and smart phone software and Sciteck which has developed and manufactures a rapid diagnostic single use test device technology ("SALIVAQUIK™"). The term "SalivaQuik" shall mean and include all rapid test strips produced by Sciteck designed for COVID-19, influenza or any other infectious disease which are part of Sciteck's Chemtest® line of dry chemistry products which "IP/Content" belong to Sciteck.
>
> WHEREAS, Sciteck intends to bring the SalivaQuik to market prior, during or after EUA submission(s) or after receipt of the Federal Drug Administration's [sic] (FDA) Emergency Use Authorization ("EUA") for laboratory, non-laboratory and/or at home use approval(s) pursuant to the Instructions For Use. Sciteck principle [sic] operations are the development, manufacturing, and selling products for dry chemistry test strips, biotechnology, urinalysis, clinical chemistry, toxicology, pharmaceuticals, treatment and safety applications and these products wholly belong to Sciteck and are protected under this agreement.
>
> BUSINESS [sic], Sciteck desires to use, as necessary and as permitted hereunder, so much allowed by Innovare to use Innovare's website,

[2] The document also contains a number of typographical errors.

software and/or smart phone applications software allowing Innovare to distribute and sell Sciteck's "IP/Content", allowing users of Sciteck's SalivaQuik technology to access the software for use in determining test results and any other functionality that may be available or updated from time to time as needed.

## Agreement

NOW, THEREFORE, in consideration of the premises [sic] contained herein and the mutual covenants and restrictions of this Agreement, all of which consideration is hereby deemed and acknowledged as both received and adequate, Innovare and Sciteck agree as follows:

. . .

2. **Grant of Licenses and Restrictions on use of IP/Content by Sciteck; Payment.**

(a) Innovare hereby grants to Sciteck a nonexclusive license (the "Sciteck License"), during the term of this Agreement, so long as Sciteck is not in breach of this Agreement, to use the Innovare Licensed IP/Content for the purposes contemplated in this Agreement and Sciteck is expressly prohibited from using any form of the Innovare Licensed IP/Content for any reason outside the scope and purpose of this Agreement.

(b) Sciteck hereby grants to Innovare a non-exclusive license (the "Sciteck License"), during the term of this Agreement, so long as Innovare is not in breach of this Agreement, to use the Sciteck Licensed IP/Content for the purposes contemplated in this Agreement. Innovare is expressly prohibited from using any form of the Sciteck Licensed IP/Content for any reason outside the scope and purpose of this Agreement.

3. **Term.** This Agreement will commence on the date of the full execution hereof and will continue for five (5) years, to be automatically renewed thereafter for successive one (1) year periods, unless terminated after year 3 per section 7.

4. **Independent Relationship, Warranty and Indemnity**.
(a) Innovare and Sciteck will, and throughout the term of this Agreement will be, independent contractors and not employees, partners or agents of the other. Neither Innovare or Sciteck shall have any authority to bind the other to any agreement or contract nor shall it have any authority to represent the other or their respective technologies, intellectual property, business or systems in a fashion

other than that expressly set forth herein and Innovare shall not be responsible for any operating expenses, fees, costs or charges, or any income or other tax liabilities of Sciteck. Sciteck shall not be responsible for any operating expenses, fees, costs, or charges, or any income or other tax liabilities of Innovare and Sciteck represents and warrants to Innovare that Sciteck's production, distribution, and sale of the SalivaQuik and Sciteck's use of the Innovare Licensed IP/Content is and will be at all times during the term of this Agreement in full compliance in all respects with all local, state and federal rules, regulations, restrictions, laws, guideline, ordinances and any similar obligation or requirement including, but not limited to, the Federal Drug Administration's [sic] EUA for the SalivaQuik. Both parties agree and shall fully indemnify each other for any reasons.

**4.[3] <u>Price, Payment Terms.</u>** For Innovare's sell [sic] and distribution of the Sciteck Licensed IP/Content and/or products, Innovare shall receive a royalty to be calculated and paid as follows: On or before the last day of the month following the end of each quarter after the signing of this agreement. [sic] Sciteck shall pay Innovare an amount equal to the number of Strips sold and/or distributed by Innovare multiplied by Thirty Cents ($0.30) for each strip sold (e.g. 30 cents per strip) and the royalties will only be due on Sciteck's receipt of funds for strips sold via Innovare Distributorship and said funds shall have cleared Sciteck's accounts prior to payment of royalties for the quarter paid. The royalty fees shall be inclusive for any and all use of programs, functions, and services provided by Innovare. For clarity, the term "sold" means the strips are no longer the property of Sciteck; the term "produced" means the strips are still the property of Sciteck.

**6. <u>Innovare Distributorship</u>.** All pricings including the wholesale price is [sic] determined and agreed upon by Innovare and Sciteck collectively. Innovare and Sciteck will determine a base cost which will include all costs of production including but not limited to packaging and the Innovare license fee as well as any agreed upon base expenses. Any amount added to the base expenses that will determine the base sale price will be split evenly between Innovare and Sciteck. All sales must be documented in a transaction log that will be maintained by Innovare and may be updated to be an electronic order system when available.

**7. Expressed Authority for Innovare Distributor**. Innovare shall use commercially reasonable efforts to market, distribute and sell the Products in the Territory. Manufacturer, represents and warrants that it has the right and authority to grant the above distribution rights to

---

[3] The Distributor Agreement contains two paragraphs labeled as "4" and none labeled as "5."

Distributor. Innovare will be considered the Class A distributor and all other distributors will be under Innovare and listed as Class B Distributors. Sciteck issues expressed authority to Innovare as Class A Distributor for SalivaQuikTM marketed products. All Class B distributor sales, appointments and inquiries must be through the Class A distributor. All sales must be documented in a transaction log that will be maintained by Innovare and may be updated to be an electronic order system when available. This Class A designation authority includes all Domestic (USA) and International territories.

**8. <u>Termination</u>**. Either party to this Agreement may terminate this Agreement for the following reasons: (i) a default by the other party hereto after expiration of all applicable notice and cure periods, (ii) a breach of any representation contained herein, or (iii) the failure to satisfy an obligation regarding payment. Either party can terminate at any time with written notice after the 3rd year of the agreement. In case of either Innovare or Sciteck's acquisition the terms of the agreement will not be affected.

**9. <u>Notice and Cure Periods</u>**. Each party has ten (10) business days from the receipt of such notice within to cure such alleged default or provide reasonable proof that such alleged default does not exist. Notice to any party hereunder shall be deemed to have been given (i) when delivered by hand or by Federal Express or a similar overnight courier, or (ii) seven (7) days following the date on which such notice is deposited in the United States Mail as Certified Mail, Return Receipt Requested, First Class Postage.

. . .

**13. Innovare Limited Use Authorization for "SalivaQuik":** Sciteck hereby authorizes Innovare to use the Sciteck SalivaQuik IP solely for the purposes contemplated in this Agreement. Innovare is expressly prohibited from using any form of the Sciteck or SalivaQuik IP for any reason outside the scope and purpose of this Agreement.

(Distributor Agreement, at 1–3.)

11. Following the execution of the Distributor Agreement, Sciteck and Innovare began discussing whether Innovare "would be capable of assisting Sciteck with internal research studies of SALIVAQUIK™ and providing feedback for

Sciteck's internal product development of SALIVAQUIK™[.]" (Am. Countercls. ¶ 48.) "Innovare represented that it was experienced in providing such Product Development Activities." (Am. Countercls. ¶ 49.) During these discussions, Sciteck informed Innovare—and Innovare acknowledged—that any research and development activities had to be conducted in compliance with RUO authorization and that SALIVAQUIK had not yet been approved for EUA uses—namely, clinical or diagnostic testing. (Am. Countercls. ¶ 49.)

12.     Following those conversations, the parties discussed whether Innovare could assist Sciteck in "performing Usability and Clinical Studies for collecting data and evidence that would be included in Sciteck's ongoing EUA application and in response to specific requests from the FDA[.]" (Am. Countercls. ¶ 50.) Any such activities were required to be conducted "in an RUO manner" and in compliance with federal regulations. (Am. Countercls. ¶ 50.) Innovare agreed to assist Sciteck "and subsequently represented that it had begun performing the Product Development Activities." (Am. Countercls. ¶ 50.) Sciteck again told Innovare (and Innovare agreed) that any usability and clinical studies must be conducted "in an RUO manner" and that SALIVAQUIK was not approved for EUA. (Am. Countercls. ¶ 51.) Sciteck asserts that SALIVAQUIK "could not legally be sold or distributed unless and until it received EUA approval from the FDA." (Am. Countercls. ¶ 52.)

13.     During 2021, Innovare repeatedly requested more SALIVAQUIK test strips, representing that such strips were necessary for performing product development and studies on behalf of Sciteck. (Am. Countercls. ¶ 54.) In response,

Sciteck provided to Innovare devices that contained the SALIVAQUIK and Sciteck trademarks "with the repeated proviso that said devices were to be used strictly for RUO purposes." (Am. Countercls. ¶ 54.) Innovare continually represented to Sciteck that it was using the devices solely in an RUO capacity, and Sciteck relied on such communications throughout the business relationship. (Am. Countercls. ¶ 56.)

14. However, Sciteck alleges in its counterclaims that "[u]pon information and belief, Innovare has promoted, marketed, distributed, administered, sold, offered for sale, or otherwise facilitated use of the SALIVAQUIK™ device in a non-RUO capacity, wherein such activity is outside the scope of Sciteck's intellectual property license, is contrary to the parties' course of conduct, is in contravention of federal law and FDA regulations and guidelines, and misrepresents the legal and regulatory status of the SALIVAQUIK™ device." (Am. Countercls. ¶ 57.) Innovare did not disclose these acts to Sciteck, and Sciteck asserts that Innovare worked to actively conceal the existence of such activities from Sciteck. (Am. Countercls. ¶ 57.)

15. Several incidents led Sciteck to the conclusion that Innovare was using the testing strips in a non-RUO manner.

16. First, Sciteck alleges that a Sciteck employee received a phone call from an employee of Innovare requesting additional devices on a date when all of Innovare's "Product Development Activities and Usability and Clinical Studies" had been completed. (Am. Countercls. ¶¶ 57–59.)

17. Second, a Sciteck employee received a phone call on 17 August 2021 from a representative of a third-party company named "Alliance Title," who stated that

the company was using the SALIVAQUIK strips to test its employees and requested an instructional video to show employees how to properly use the strips. (Am. Countercls. ¶ 60.) Sciteck alleges that the Alliance Title representative knew to contact Sciteck with this request because the devices bore the Sciteck and SALIVAQUIK trademarks. (Am. Countercls. ¶ 61.)

18.    In response to this phone call, Sciteck contacted Innovare, and an Innovare employee confirmed that Innovare had "facilitated testing" for Alliance Title and "also a third-party airline company" in March 2021, but claimed that such testing was conducted in an RUO manner and not as part of a sale. (Am. Countercls. ¶ 63.) Sciteck asserts, however, that RUO guidelines forbid use of a device for "clinical or diagnostic testing unless and until EUA approved" and require strict supervision by "licensed clinicians/physicians" in highly controlled research settings. (Am. Countercls. ¶ 64.) Sciteck alleges that this conduct by Innovare was in contravention of federal law. (Am. Countercls. ¶ 65.)

19.    Third, at some point Innovare contacted Sciteck, requesting that Sciteck assist Innovare in obtaining regulatory approval for SALIVAQUIK in one or more foreign countries, including Vietnam. (Am. Countercls. ¶ 68.) Sciteck alleges that Innovare asked Sciteck to register the SALIVAQUIK device on the FDA Unified Registration and Listing System ("FURLS"), which lists medical devices that have been FDA approved. (Am. Countercls. ¶ 69–70.) Sciteck refused to follow up on Innovare's request because Sciteck concluded it was "improper and potentially

illegal" to register the test strips on FURLS prior to the receipt of FDA or EUA approval. (Am. Countercls. ¶ 71.)

20. Sciteck also alleges that Innovare entered into contracts with third parties while representing that it was "doing business as SALIVAQUIK™ or another one of Sciteck's IP." (Am. Countercls. ¶ 74.) Specifically, Sciteck asserts that Innovare entered into distribution contracts for SALIVAQUIK, received compensation from those contracts, and failed to disclose or share any portion of that compensation with Sciteck. "[P]rior to October 1, 2021, Innovare entered into distribution contracts with third parties for the SALIVAQUIK™ device, with said contracts providing Innovare with compensations, or at least creating pricing structures, without providing Sciteck with knowledge of these contracts and without compensating Sciteck with the money pursuant to the contracts." (Am. Countercls. ¶ 79.) "Innovare entered into these agreements and held out to these third parties that Innovare had authority to bind Sciteck to these distribution contracts[.]" (Am. Countercls. ¶ 81.) Sciteck further alleges that these contracts were not for research purposes as they were in "excessively large amounts." (Am. Countercls. ¶ 83.) Sciteck also asserts that Innovare did not keep a transaction log of the devices as mandated by the Distributor Agreement. (Am. Countercls. ¶¶ 94, 97.)

21. In addition, Sciteck's counterclaims allege that Innovare bears responsibility for Sciteck's failure to obtain EUA approval for SALIVAQUIK. On 4 October 2021, the FDA asked Sciteck to address certain deficiencies with Innovare's data collection and the software Innovare had developed for SALIVAQUIK. The FDA

requested a response by 7 October 2021. (Am. Countercls. ¶ 105.) Although Sciteck immediately contacted Innovare about the deficiencies, Innovare did not immediately respond and ultimately failed to supply any necessary information before the FDA's deadline. (Am. Countercls. ¶¶ 106–107.) Instead, Innovare's counsel contacted Sciteck on 22 October 2021 to accuse Sciteck of various breaches of the Distributor Agreement. (Am. Countercls. ¶ 108.)

22. On 21 December 2021, the FDA contacted Sciteck regarding certain concerns about Sciteck's website. During the conversation surrounding the website, Sciteck made the FDA aware of a website set up by Innovare for SALIVAQUIK and informed the FDA that Sciteck did not have any access to that website. (Am. Countercls. ¶¶ 113–14.) According to Sciteck, during a subsequent conversation between the FDA and Innovare, an Innovare representative falsely told the FDA it had not accepted money for distribution of SALIVAQUIK when, in fact, it had actually done so. (Am. Countercls. ¶¶ 117–18.)

23. Sciteck asserts that the unauthorized promotion, marketing, distribution, and sale of the test strips by Innovare have placed Sciteck at risk of adverse action from regulatory authorities. (Am. Countercls. ¶ 59.)

24. On 6 December 2021, Innovare filed a Complaint in Henderson County Superior Court initiating this action. (Compl., ECF No. 2.) In its Complaint, Innovare asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, declaratory judgment, specific performance, and unfair and deceptive trade practices ("UDTP") as well as claims for

injunctive relief. (Compl. ¶¶ 24–60.) This case was designated a mandatory complex business case and assigned to the undersigned on 7 December 2021. (ECF No. 1.)

25. Sciteck filed an Answer and Counterclaims on 4 February 2022. (ECF No. 10.) In its Answer, Sciteck asserted 49 affirmative defenses along with counterclaims for unfair competition, conversion, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Lanham Act, and UDTP. (ECF No. 10.)

26. On 6 April 2022, Innovare filed a Motion to Dismiss Counterclaims and Motion to Strike Affirmative Defenses seeking dismissal of Sciteck's counterclaims pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and to have Sciteck's affirmative defenses stricken under Rule 12(f). (ECF No. 17.)

27. Sciteck filed a Motion for Leave to Amend Answer and Counterclaims on 13 September 2022 pursuant to Rule 15, seeking to file a proposed Amended Answer and Counterclaims, which it submitted along with its Motion to Amend. (ECF Nos. 44, 44.1.) Sciteck's proposed amended counterclaims restated its original counterclaims and added claims for fraud, declaratory judgment, specific performance, and unjust enrichment. In addition, the amended answer contained 42 affirmative defenses.

28. The Motions came before the Court for a hearing on 23 September 2022. Following the hearing, the Court ordered supplemental briefing on certain issues. (ECF No. 48.) The Motions are now ripe for resolution.

## LEGAL STANDARD

29. Rule 15 of the North Carolina Rules of Civil Procedure states, in pertinent part, as follows:

> A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not yet been placed upon the trial calendar, he may so amend it at any time within 30 days after it is served. Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

N.C. R. Civ. P. 15(a).

30. Our Supreme Court has held that "[t]here is no more liberal canon in the rules than that leave to amend shall be freely given when justice so requires." *Vaughan v. Mashburn*, 371 N.C. 428, 434 (2018) (cleaned up). "This liberal amendment process under Rule 15 complements the concept of notice pleading embodied in Rule 8 and reflects the legislature's intent that decisions be had on the merits and not avoided on the basis of mere technicalities." *Id.* (cleaned up).

31. Nevertheless, "the [R]ules still provide some protection for parties who may be prejudiced by liberal amendment." *Henry v. Deen*, 310 N.C. 75, 82 (1984) (citation omitted). "Reasons for justifying denial of an amendment include: (1) undue delay, (2) bad faith, (3) undue prejudice, (4) futility of amendment, and (5) repeated failure to cure defects by previous amendments." *Howard v. IOMAXIS, LLC*, 2021 NCBC LEXIS 116, at \*17 (N.C. Super. Ct. Dec. 22, 2021) (citation omitted). Motions to amend are "addressed to the discretion of the trial court." *Vaughan*, 371 N.C. at 433 (citation omitted).

32.     "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the [counterclaim] on its face reveals that no law supports the [defendant]'s claim; (2) the [counterclaim] on its face reveals the absence of facts sufficient to make a good claim; or (3) the [counterclaim] discloses some fact that necessarily defeats the [defendant]'s claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cnty.*, 355 N.C. 161, 166 (2002)).  The Court may also "reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the [counterclaim]." *Laster v. Francis*, 199 N.C. App. 572, 577 (2009) (cleaned up).

33.     Rule 12(f) provides that a court "may order stricken from any pleading any insufficient defense or any redundant, irrelevant, immaterial, impertinent, or scandalous matter."  N.C. R. Civ. P. 12(f).  The purpose of this Rule "is to avoid expenditure of time and resources before trial by removing spurious issues, whether introduced by original or amended complaint." *Estrada v. Jaques*, 70 N.C. App. 627, 642 (1984) (citations omitted).  A motion to strike "is addressed to the sound discretion of the trial court[.]" *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 25 (2003) (citation omitted).

### ANALYSIS

I.     **Motion to Amend**

34.     Innovare primarily opposes Sciteck's Motion to Amend on the grounds of undue delay and futility.

35.     We have previously stated the following on the issue of what constitutes undue delay in the amendment of pleadings:

> "In deciding if there was undue delay, the trial court may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit." *Draughon v. Harnett County Bd. of Educ.*, 166 N.C. App. 464, 467, 602 S.E.2d 721, 724 (2004); *Stetser v. TAP Pharm. Prods. Inc.*, 165 N.C. App. 1, 31, 598 S.E.2d 570, 590 (2004) ("[T]he trial court, in its discretion, may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit."). The "trial court may appropriately deny a motion for leave to amend on the basis of undue delay where a party seeks to amend its pleading after a significant period of time has passed since filing the pleading and where the record or party offers no explanation for the delay." *Rabon*, 208 N.C. App. at 354, 703 S.E.2d at 184. Close proximity to a hearing on motions that would be mooted by amendment to the complaint is a factor courts can consider in favor of finding undue delay. *See Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 679, 748 S.E.2d 154, 161 (2013) (upholding the trial court's denial of a motion to amend that was filed thirteen months after the initial complaint was filed and "only five days before the hearing on defendants' motion for summary judgment").
>
> A court also may deny a motion to amend when the proposed amendments involve new defendants and/or new, separate and distinct claims that would require additional or different discovery. When "[d]ifferent evidence would be necessary to support [ ] additional legal claims, which could involve more discovery for the parties, slow the litigation process, and present a more unwieldy litigation for the trial court to administrate," the trial court likely does not abuse its discretion in concluding that allowing such motion to amend would be prejudicial to the current defendants. *Stetser*, 165 N.C. App. at 32, 598 S.E.2d at 590-91.

*Global Textile Alliance, Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 30, at *10–11 (N.C. Super. Ct. Apr. 6, 2018).

36.     The Court concludes that Sciteck's Motion to Amend should not be denied on the ground of undue delay. Sciteck has represented to the Court that new allegations that are material to its proposed amendments were only discovered after

the filing of its initial counterclaims. The Court also notes that Sciteck's previous counsel withdrew from this action, and its new counsel filed the Motion to Amend approximately three months after entering an appearance. The Court is not convinced that any delay in doing so was excessive.

37. Having concluded that Sciteck's Motion to Amend should not be denied on the basis of undue delay, the Court must still address Innovare's futility argument. The parties have fully briefed and argued the validity of Innovare's contentions in support of its Motion to Dismiss with regard to both Sciteck's *original* counterclaims and its proposed *amended* counterclaims. Therefore, the Court, in the exercise of its discretion and consistent with notions of judicial economy, has considered together Innovare's arguments made both in its Motion to Dismiss and in its brief in opposition to Sciteck's Motion to Amend as to all of the counterclaims Sciteck has asserted, or seeks leave to assert, in this action in order to assess their legal validity. *See Gateway Mgmt. Servs. v. Carrbridge Berkshire Grp., Inc.*, 2018 NCBC LEXIS 45, at *8 (N.C. Super. Ct. May 9, 2021) ("Although an amended pleading would ordinarily moot a pending motion to dismiss, the Court will consider Defendants' Motions to Dismiss as to the Amended Complaint because Defendants and Plaintiff both addressed the sufficiency of the Amended Complaint in their respective briefs and at the hearing.").

38. For the reasons set out below, Sciteck's Motion to Amend is GRANTED, in part, and DENIED, in part.

## II. Motion to Dismiss

### A. Breach of Contract

39.     Innovare seeks dismissal of Sciteck's breach of contract counterclaim based on its contention that the Distributor Agreement does not contain language sufficient to support Sciteck's attempt to plead an actionable breach.[4]

40.     "The elements of a claim for breach of contract are (1) existence of a valid contract; and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000) (citing *Jackson v. California Hardwood Co.*, 120 N.C. App. 870, 871 (1995)).

41.     As an initial matter, the Court notes that at least some of the allegations Sciteck makes in support of its breach of contract counterclaim are not limited to Innovare's actual contractual duties as set out in the Distributor Agreement.

42.     The Distributor Agreement essentially defines Innovare's role in developing software and other proprietary systems relating to SALIVAQUIK, establishes Innovare as a Class A distributor of SALIVAQUIK strips, and governs the scope of its permissible use of Sciteck's intellectual property during the life of the contract.

43.     A number of the allegations supporting Sciteck's breach of contract counterclaim, however, are based on the assertion that Innovare failed to properly carry out its duties in helping Sciteck obtain EUA approval for SALIVAQUIK. Critically, the contract does not require Innovare to provide such assistance. Rather,

---

[4] The parties do not dispute that the Distributor Agreement attached to Innovare's Complaint is the contract between the parties upon which Sciteck's breach of contract counterclaim is based. (ECF No. 3.)

to the contrary, the Agreement expressly places the burden of ensuring such regulatory compliance upon *Sciteck*. Specifically, the Distributor Agreement states that

> Sciteck represents and warrants to Innovare that Sciteck's production, distribution and sale of the SalivaQuik and Sciteck's use of the Innovare Licensed IP/Content is and will be . . . in full compliance in all respects with all local, state and federal rules, regulations, restrictions, laws, guideline, ordinances and any similar obligation or requirement including, but not limited to the Federal Drug Administration's [sic] EUA for the SalivaQuik.

(Distributor Agreement ¶ 4.)

44.     Thus, any alleged failure by Innovare to assist Sciteck in obtaining regulatory approval for SALIVAQUIK cannot serve as a basis for Sciteck's breach of contract counterclaim.[5]

45.     However, the Court finds that Sciteck has made sufficient allegations in other respects for its breach of contract counterclaim to survive Innovare's Motion to Dismiss. The Distributor Agreement requires Innovare to notify Sciteck of all sales of SALIVAQUIK and to keep transaction logs, which Sciteck has alleged that Innovare failed to do. The Distributor Agreement's payment provisions obligate Innovare to keep track of individual strips sold through "a transaction log that will be maintained by Innovare and may be updated to be an electronic order system when available." (Distributor Agreement ¶ 6.) Sciteck has alleged that Innovare made

---

[5] The Court also rejects Sciteck's argument that the Distributor Agreement imposes such obligations upon Innovare based on the language contained in Section 7 of the Agreement requiring Innovare to "use commercially reasonable efforts to market, distribute and sell the Products in the Territory." The language of this provision simply does not allow for the interpretation advanced by Sciteck. (Distributor Agreement ¶ 7.)

sales of the test strips to outside parties without complying with these requirements. Similarly, Sciteck's allegations, if true, would potentially render Innovare liable for breach of contract by virtue of it having obtained compensation for such sales at Sciteck's expense in violation of the contractual language governing the allocation of such payments.

46.     Finally, Sciteck's allegations also adequately allege a breach of Section 13 of the Distributor Agreement, which prohibits Innovare "from using any form of the Sciteck or SalivaQuik IP for any reason outside the scope and purpose of this agreement." (Distributor Agreement ¶ 13.) Sciteck's counterclaims repeatedly allege that Innovare improperly used SALIVAQUIK for purposes not permitted under the contract.

47.     Accordingly, to the extent that Sciteck's counterclaim for breach of contract is based, in part, on Innovare's alleged failure to provide assistance in obtaining approval from the FDA for SALIVAQUIK, Innovare's Motion to Dismiss is GRANTED.  However, in all other respects, Innovare's Motion to Dismiss is DENIED as to Sciteck's counterclaim for breach of contract.

## B. Breach of Implied Covenant of Good Faith and Fair Dealing

48.     Innovare's argument seeking dismissal of Sciteck's counterclaim for breach of the implied covenant of good faith and fair dealing is essentially derivative to its contention that no valid breach of contract claim has been stated.

49.     "In every contract, there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to

receive the benefits of the agreement." *Pro-Tech Energy Solutions, LLC v. Cooper*, 2014 NCBC LEXIS 76, at **21 (N.C. Super. Ct. July 30, 2015) (quoting *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985)).

50.     The conduct alleged by Sciteck in connection with its breach of the implied covenant of good faith and fair dealing counterclaim overlaps with its breach of contract allegations.  Where a breach of contract claim survives dismissal, we have previously declined to dismiss a claim for breach of the implied covenant of good faith and fair dealing.  *Se. Anesthesiology Consultants, PLLC v. Rose*, 2019 NCBC LEXIS 52, at *23 (N.C. Super. Ct. Aug. 20, 2019) (stating the well-settled proposition that a good faith and fair dealing claim that is "part and parcel" of a breach of contract claim "stand[s] or fall[s] together with the related breach of contract claim") (cleaned up).

51.     Innovare's Motion to Dismiss Sciteck's counterclaim for breach of the implied covenant of good faith and fair dealing is therefore DENIED.

## C. Unjust Enrichment

52.     Innovare asserts that dismissal of Sciteck's unjust enrichment claim is appropriate on the ground that such a claim is not available where—as here—a contract exists between the parties.

53.     We have previously stated the following regarding claims for unjust enrichment:

> "In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Islet Scis., Inc. v. Brighthaven Ventures, LLC*, 2017 NCBC LEXIS 4, at *16 (N.C. Super. Ct. Jan. 12, 2017) (citing *Se. Shelter Corp.*

*v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002)). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atl. Coast Line R.R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95-96, 150 S.E.2d 70, 73 (1966). However, "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).

*Higgins v. Synergy Coverage Sols., LLC,* 2020 NCBC LEXIS 6, at \**23 (N.C. Super. Ct. Jan 15, 2020).

54. In this case, the counterclaims allege that a contractual relationship existed between the parties—namely, the Distributor Agreement. Sciteck makes a conclusory assertion in its brief that Innovare's allegedly unauthorized use of its intellectual property after the contract terminated may have given rise to additional damages beyond those recoverable under a breach of contract theory. However, Sciteck has failed to offer any persuasive argument in support of this contention.

55. The Court therefore GRANTS Innovare's Motion to Dismiss Sciteck's unjust enrichment counterclaim, which is DISMISSED with prejudice.

**D. Conversion**

56. Sciteck's counterclaim for conversion stems from its allegations that Innovare wrongly retained the SALIVAQUIK test strips that it had received from Sciteck. In its Motion to Dismiss, Innovare contends that this clam fails because (1) Innovare obtained the strips through legal means; and (2) Sciteck does not allege that it ever demanded that Innovare return the strips at issue.

57. "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (citation omitted). "In cases where the defendant comes into possession of the plaintiff's property lawfully, the plaintiff must show that it made a demand for the return of the property that was refused by the defendant." *Morris Int'l v. Packer*, 2021 NCBC LEXIS 99, at **27 (N.C. Super. Ct. Nov. 2, 2021) (citing *Hoch v. Young*, 63 N.C. App. 480, 483 (1983)).

58. Sciteck's counterclaims do not contain any allegation that Innovare came into possession of the test strips illegally. To the contrary, Sciteck does not contest the fact that Innovare received the strips from Sciteck pursuant to the Distributor Agreement. Moreover, Sciteck does not allege that Innovare ever ignored a demand for the return of the strips or—even more basically—that any such demand was ever made in the first place.

59. The Court therefore GRANTS Innovare's Motion to Dismiss Sciteck's counterclaim for conversion, and this counterclaim is DISMISSED with prejudice.

**E. Unfair Competition**

60. Innovare moves for dismissal of Sciteck's common law claim for unfair competition based on Sciteck's failure to allege that a competitor relationship existed between the two parties.

61. North Carolina law has consistently held that unfair competition claims, including those based on trademark infringement, can only be asserted against

competitors. *See Triage Logic Mgmt. & Consulting, LLC v. Innovative Triage Servs., LLC*, 2020 NCBC LEXIS 94, at **29 (N.C. Super. Ct. Aug. 11, 2020) ("In North Carolina, common law unfair competition claims are limited to claims between business competitors.") (cleaned up); *Gateway Mgmt. Servs., Ltd. v. Carrbridge Berkshire Grp., Inc.*, 2018 NCBC LEXIS 45, at *18 (N.C. Super. Ct. May 9, 2018) ("Common law unfair competition claims are limited to claims between business competitors[.]") (cleaned up).

62.    In this case there are no allegations by Sciteck that Innovare and Sciteck were engaged in a competitive relationship.  To the contrary, the counterclaims (and the Distributor Agreement) allege that the parties' relationship was that of a manufacturer and distributor.

63.    The Court therefore GRANTS Innovare's Motion to Dismiss Sciteck's unfair competition counterclaim, and this claim is DISMISSED without prejudice.[6]

**F. Fraud**

64.    Innovare seeks dismissal of Sciteck's fraud counterclaim on the ground that it fails to satisfy the pleading requirements imposed by N.C. R. Civ. P. 9(b).

65.    Claims alleging fraud are subject to a heightened pleading standard under the North Carolina Rules of Civil Procedure, which require that "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  N.C. R. Civ. P. 9(b).

---

[6] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013) (citation omitted).

66.     We have previously held that

> [t]o state a claim for fraud, the plaintiff must show: (1) a false representation or concealment of material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) that does in fact deceive, and (5) results in damage to the plaintiff. *Harrold v. Dowd*, 149 N.C. App. 777, 782, 561 S.E.2d 914, 918 (2002) (citing *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)).

> Rule 9(b) of the North Carolina Rules of Civil Procedure requires fraud claims to be pled with particularity. N.C. R. Civ. P. 9(b). "Mere generalities and conclusory allegations of fraud will not suffice." *Sharp v. Teague*, 113 N.C. App. 589, 597, 439 S.E.2d 792, 797 (1994) (quoting *Moore v. Wachovia Bank & Trust Co.*, 30 N.C. App. 390, 391, 226 S.E.2d 833, 835 (1976)).

> The particularity requirement of Rule 9(b) means that a plaintiff must specifically allege the time, place and content of the alleged fraudulent misrepresentation or concealment, and the identity of the person who concealed the information. *See Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981).

*Allran v. Branch Banking & Trust Corp.*, 2011 NCBC LEXIS 20, at \*\*8–9 (N.C. Super. Ct. July 6, 2011).

67.     In cases where a fraud claim is premised on a theory of concealment, the pleading must include:

> (1) the relationship between plaintiff and defendant giving rise to the duty to speak, (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what the defendant gained by withholding information, (6) why plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance.

*Id.* at \*10 (cleaned up).

68. In its counterclaims, Sciteck alleges generally that Innovare "concealed its distribution agreements and profiting from Sciteck's SALIVAQUIK™ device from Sciteck" and that "Innovare knowingly concealed these agreements so it would not have to provide compensation to Sciteck with the intent to deceive Sciteck." (Am. Countercls. ¶¶ 169, 171.) These allegations are too general to comport with the heightened pleading standard under Rule 9(b). The Court therefore concludes that Innovare's Motion to Dismiss should be GRANTED as to Sciteck's counterclaim for fraud, which is DISMISSED without prejudice.

**G. Lanham Act**

69. Innovare asks the Court to dismiss Sciteck's claim under 15 U.S.C. § 1125(a) (the "Lanham Act"). Innovare argues that Sciteck lacks the ability to bring a claim under the Lanham Act because Sciteck has not alleged a requisite reputational or competitive injury that occurred as a proximate result of Innovare's conduct.[7] In response, Sciteck contends that it has pled a valid Lanham Act claim by alleging that Innovare engaged in the unauthorized use of Sciteck's SALIVAQUIK mark beyond the scope of the Distributor Agreement given the absence of FDA approval of the strips for commercial use and that Innovare's actions damaged Sciteck's reputation in the marketplace. The Court agrees with Sciteck.

70. 15 U.S.C. § 1125 states, in pertinent part, as follows:

---

[7] Innovare originally sought dismissal of this claim based on its assertion that Sciteck's failure to plead that it was a direct competitor of Sciteck served as an absolute bar to recovery under the Lanham Act. However, in supplemental briefing, Innovare effectively conceded that the absence of such an allegation in Sciteck's counterclaim does not, by itself, mandate dismissal of this claim.

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> **(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (2021).

71.     In this claim, Sciteck has alleged, *inter alia*, that Innovare caused test strips bearing Sciteck's SALIVAQUIK mark to be sold to third-parties despite the absence of prior FDA approval and that said use was beyond the scope of the Distributor Agreement.  Sciteck further asserts Innovare's conduct caused it to suffer damages—including reputational injury—as a result of its product (bearing Sciteck's mark) being distributed in an unlawful manner that misled consumers into believing that *Sciteck* was distributing a product without regulatory approval to do so.

72.     On a number of occasions, courts have allowed Lanham Act claims to proceed on analogous facts.  *See, e.g.,  Choice Hotels Int'l, Inc. v. A Royal Touch Hosp., LLC (NC)*, 409 F. Supp. 3d 559, 565–68 (W.D. Va. 2019) (entering summary judgment for plaintiff on a § 1125(a) claim when a franchisee continued to use a franchisor's mark after expiration of the franchise agreement); *Halo Optical Prods. Inc. v. Liberty*

*Sport, Inc.*, 2017 U.S. Dist. LEXIS 41084, at *27–33 (N.D.N.Y. Mar. 22, 2017) (granting summary judgment for plaintiff distributor on a Lanham Act claim concerning use of a trademark beyond the scope of a licensing agreement); *Ford Motor Co. v. Thermoanalytics, Inc.*, 2015 U.S. Dist. LEXIS 145965, at *13–14 (E.D. Mich. Oct. 28, 2015) (finding trademark infringement when the defendant "[e]xceeded the [s]cope of the [l]icensing [a]greement" as the former licensee created a "likelihood of confusion" by continuing to use the formerly licensed trademark).

73.     Although it remains to be seen whether Sciteck will ultimately be able to offer evidence to support this claim, the Court is satisfied that Sciteck has sufficiently pled a claim under the Lanham Act.  Innovare's Motion to Dismiss Sciteck's counterclaim under the Lanham Act is therefore DENIED.

**H. UDTP**

74.     Innovare further contends that Sciteck's allegations in its amended counterclaims cannot support a claim for UDTP under Chapter 75 of the North Carolina General Statutes.  The Court is unpersuaded.

75.     It is well established that "[t]he three *prima facie* elements of a UDTP Act claim are: (1) an unfair or deceptive trade practice; (2) in or affecting commerce; and (3) proximately causing actual injury."  *Avadim Health, Inc. v. Harkey*, 2021 NCBC LEXIS 104, at **26–27 (N.C. Super. Ct. Nov. 30, 2021) (cleaned up).

76.     Although Innovare argues that none of the acts alleged by Sciteck can properly be deemed an "unfair or deceptive trade practice," a claim for trademark infringement—as exists here based on Sciteck's Lanham Act counterclaim that the

Court has declined to dismiss—can suffice to establish liability under Chapter 75. *See JCG & Assocs. LLC v. Disaster Am. USA LLC*, 2022 NCBC LEXIS 156, at **21 (N.C. Super. Ct. Dec. 12, 2022) ("This [trademark] infringement is also an unfair and deceptive trade practice . . . under section 75-1.1.") (cleaned up).

77.     Therefore, at a minimum, Sciteck has properly stated a UDTP counterclaim stemming from Innovare's alleged trademark infringement.[8] Accordingly, the Court DENIES Innovare's Motion to Dismiss Sciteck's counterclaim for UDTP.

## I.  Declaratory Judgment

78.     Sciteck's declaratory judgment counterclaim requests declaratory relief from the Court on the following issues:

> a.      Whether Innovare's conduct constitutes a breach of the [Distributor] Agreement;
> b.      Whether Innovare must act in good faith under the Agreement and must provide reasonable information under the Agreement as requested by Sciteck; and
> c.      Whether Innovare's putative contract interpretations of the Agreement and allegations that Sciteck is in breach are legally and factually meritless.

(Amended Counterclaim ¶¶ 179–180.)

79.     All of these issues concern questions that the Court will have to resolve in addressing the parties' respective claims for breach of contract such that the declaratory judgment claim is duplicative.

---

[8] Thus, the Court need not address at the present time whether any of the other conduct alleged in Sciteck's counterclaims likewise suffices to establish liability under Chapter 75.

80.     Therefore, the Court GRANTS Innovare's Motion to Dismiss Sciteck's declaratory judgment counterclaim, and this counterclaim is DISMISSED with prejudice.

**J. Specific Performance**

81.     Finally, Innovare seeks dismissal of Sciteck's specific performance claim, arguing that dismissal is proper because such a claim is not supported by Sciteck's allegations.  The Court agrees.

82.     We have previously stated that

> "[t]he remedy of specific performance is available to compel a party to do precisely what he ought to have done without being coerced by the court." *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694 (1981) (internal quotation marks omitted).  "To receive specific performance, the law requires the moving party to prove that (i) the remedy at law is inadequate, (ii) the obligor can perform, and (iii) the obligee has performed [her] obligations." *Reeder v. Carter*, 226 N.C. App. 270, 275 (2013) (cleaned up). Damages must be inadequate.  *See Whalehead Properties v. Coastland Corp.*, 299 N.C. 270, 282 (1980).

*Howard v. IOMAXIS, LLC,* 2022 NCBC LEXIS 146, at **18–19 (N.C. Super. Ct. Dec. 5, 2022).

83.      In Sciteck's counterclaim for specific performance, Sciteck merely reiterates its allegations of Innovare's allegedly unauthorized use of the SALIVAQUIK devices and requests that Innovare be barred from any additional improper use.  However, in asserting this claim, Sciteck appears to confuse a specific performance claim with a request for injunctive relief.  Because Sciteck's allegations in support of this counterclaim fail to establish its entitlement to specific

performance, the Court therefore GRANTS Innovare's Motion to Dismiss this claim, and Sciteck's counterclaim for specific performance is DISMISSED with prejudice.

## III. Motion to Strike

84. Innovare also moves to strike all of the affirmative defenses asserted by Sciteck in this case, claiming that the number of defenses raised by Sciteck are excessive and that many bear no factual relation to the issues in this case. As noted earlier, Sciteck's original Answer contained 49 affirmative defenses, and its proposed Amended Answer contains 42 defenses.

85. This Court disfavors a "kitchen sink" approach to the pleading of affirmative defenses and has—in appropriate circumstances—stricken defenses that were purely speculative. *See, e.g., Nat'l Fin. Partners Corp. v. Ray*, 2014 NCBC LEXIS 50, at **19–24 (N.C. Super. Ct. Oct. 13, 2014) (striking affirmative defenses that were "speculative at the time Plaintiffs asserted them in their responsive pleading," regardless of "Plaintiffs' professed good faith belief that their presently unsupported defenses will acquire the requisite factual support through the discovery stage[.]").

86. The Court agrees that the number of Sciteck's affirmative defenses is excessive and admonishes Sciteck for its scattershot approach to asserting defenses in this case. However, it is incumbent upon Innovare as the moving party to demonstrate with specificity which affirmative defenses have been inappropriately raised. In their Motion to Strike, Innovare has only identified four such defenses: force majeure, illegal restraint of trade, preemption, and the political question

doctrine.  In Sciteck's Amended Answer, it has deleted its political question doctrine defense but has retained the other three affirmative defenses specifically identified by Innovare as improper.

87.    The Court concludes that Sciteck has failed to offer any valid basis for the affirmative defenses of force majeure, restraint of trade, or preemption in this case.  Therefore, Innovare's Motion to Strike as to those defenses is GRANTED, and Sciteck shall be precluded from including these defenses when it files its Amended Answer.  However, because Innovare has not specifically identified any other specific affirmative defenses that should be stricken, Innovare's Motion to Strike Sciteck's remaining defenses is otherwise DENIED without prejudice to its ability to refile said motion at a later date.[9]

**CONCLUSION**

**THEREFORE, IT IS ORDERED** as follows:

1. Sciteck's Motion to Amend is **GRANTED**, in part, and **DENIED**, in part.

2. Innovare's Motion to Dismiss Sciteck's breach of contract counterclaim is **GRANTED**, in part, and **DENIED**, in part.

3. Innovare's Motion to Dismiss Sciteck's counterclaims for conversion, unjust enrichment, declaratory judgment, and specific performance is **GRANTED**, and these counterclaims are **DISMISSED** with prejudice.

---

[9] Nevertheless, the Court reminds Sciteck's counsel of its obligations under Rule 11 to ensure that any affirmative defenses contained in the Amended Answer it files in this case as authorized herein are "well grounded in fact and . . .  warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law[.]" N.C.R. Civ. P. 11(a).

4. Innovare's Motion to Dismiss Sciteck's counterclaims for common law unfair competition and fraud is **GRANTED**, and those counterclaims are **DISMISSED** without prejudice.

5. Innovare's Motion to Dismiss Sciteck's counterclaims for breach of the implied covenant of good faith and fair dealing, UDTP, and violation of the Lanham Act is **DENIED**.

6. Innovare's Motion to Strike is **GRANTED** as to Sciteck's affirmative defenses of force majeure, restraint of trade, and preemption. Innovare's Motion to Strike is otherwise **DENIED** without prejudice.

7. Sciteck is directed to file **within seven (7) days** an Amended Answer and Counterclaims **that is consistent in all respects with the Court's rulings herein**.[10]

SO ORDERED, this the 19th day of January, 2023.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases

---

[10] Thus, the Amended Answer and Counterclaims to be filed by Sciteck shall *not* contain the counterclaims the Court has dismissed herein or the affirmative defenses that the Court has ordered stricken.